# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 1, 2009

## STATE OF TENNESSEE v. GERRALDO WHITE

**Appeal from the Criminal Court for Shelby County**
**No. 04-07181     John P. Colton, Jr., Judge**

---

**No. W2008-02579-CCA-R3-CD  - Filed January 25, 2010**

---

The Defendant, Gerraldo White, was charged with one count of first degree premeditated murder and one count of felony murder. See Tenn. Code Ann. § 39-13-202(a)(1), (2).  He was also charged with one count of especially aggravated robbery, a Class A felony. See Tenn. Code Ann. § 39-13-403(b).  Following a jury trial, he was convicted of one count of felony murder, one count of especially aggravated robbery, and one count of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210(c).  The trial court sentenced the Defendant as a Range I, standard offender to fifteen years for second degree murder and fifteen years for especially aggravated robbery.  It also sentenced him to life in prison for felony murder.  The trial court ordered that the Defendant serve his sentences concurrently with one another, for a total effective sentence of life in the Department of Correction.  In this direct appeal, the Defendant contends that: (1) the trial court erred in denying his motion to suppress a statement he made to police; and (2) the State presented evidence insufficient to convict him of felony murder, second degree murder or especially aggravated robbery. After our review, we affirm the Defendant's conviction for first degree felony murder.  We direct that the second degree murder conviction be merged into the first degree murder conviction.  We modify the conviction for especially aggravated robbery to a conviction for aggravated robbery, and we remand for sentencing on the aggravated robbery conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Gerraldo White.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Glen Baity and Alexia Fulghum, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

Testimony in this case was heard at a suppression hearing held on June 16, 2008, and at a jury trial held from June 17 through 20, 2008. The crime at issue in this case occurred in May 2004.

**I. Motion to Suppress**

Lieutenant Lezley Currin, at the time a sergeant in the Memphis Police Department's ("MPD") homicide division, testified at the suppression hearing that she investigated the killing of the victim, Deangelo Shaw. During the course of her investigation, she developed as suspects the Defendant, Joshua Taylor, and Quincie Washington. She began talking to the Defendant, a juvenile at the time, at 2:53 p.m. on June 5, 2004, after having him brought to the MPD homicide office at about 11:30 a.m. that day. The Defendant's mother, Gloria White, was also present.

After receiving Ms. White's permission to question the Defendant, Lieutenant Currin read the Defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The Defendant and Ms. White both signed a waiver of rights form. Lieutenant Currin first asked the Defendant if he had any knowledge about another case she was investigating that also involved a shooting. He responded that he did not. Lieutenant Currin then asked the Defendant whether he had any knowledge of the victim's death. The Defendant responded that he did not, but he began to cry. Ms. White then told Lt. Currin to stop questioning the Defendant. Lieutenant Currin did so and relocated the Defendant to juvenile court. The Defendant was fifteen years old at the time.

Lieutenant Currin continued to investigate the victim's death, and she was able to obtain statements from Joshua Taylor and Quincie Washington, the other suspects in this case. Both implicated the Defendant. On June 7, 2004, Lt. Currin called Ms. White and told her about her discussions with Taylor and Washington; Ms. White responded that she had spoken to some people in her neighborhood and believed the Defendant had not been truthful on June 5. Ms. White agreed to give Lt. Currin the opportunity to speak to the Defendant again.

-2-

Lieutenant Currin and Ms. White arrived at juvenile court at about 12:30 p.m. on June 7. Ms. White accompanied the Defendant at juvenile court proceedings until later in the day, when she and the Defendant were brought to Lt. Currin's interview room. Lieutenant Currin was told that, while in the elevator on the way to the interview room, the Defendant had punched the wall, banged his head, and screamed, "I am not a murderer." Lieutenant Currin observed a scratch above the Defendant's right eye and redness around the knuckles on his right hand.

At some point after they arrived in the interview room, Lt. Currin said she again read Miranda warnings to Ms. White and the Defendant. Lt. Currin did not present them with another waiver of rights form, although she apparently read the warnings from the form Ms. White and the Defendant had signed on June 5. Lieutenant Currin did not say specifically when these Miranda warnings were given, although the following exchange took place on cross-examination:

> [Defense Counsel]: So you went to Juvenile Court specifically in connection with [this case]?
>
> [Lieutenant Currin]: Yes.
>
> [Defense Counsel]: Now, did you explain to [the Defendant] and his mom what his rights were? Did you give him his Miranda warnings this time?
>
> [Lieutenant Currin]: Yes.

Ms. White encouraged the Defendant to give a statement; she said she wanted the Defendant to tell Lt. Currin what he knew. The Defendant began to cry, and said that he did not know anything and that he was not a murderer. Ms. White said she knew the Defendant was lying about not knowing anything. She and the Defendant prayed together. Lieutenant Currin could not remember whether she showed the Defendant the statements she had taken from Taylor and Washington.

The Defendant then agreed to give a statement. He began to do so at about 3:00 p.m. Lieutenant Currin typed his responses to various questions. His statement inculpated him in the murder of the victim. Ms. White signed the Defendant's statement at 4:26 p.m.; the Defendant signed the statement at 4:30 p.m. Both were given an opportunity to read through the statement and make corrections. Lieutenant Currin noted that, while giving his statement, the Defendant alternated between crying uncontrollably and laughing uncontrollably. The Defendant was not deprived of food or water, nor was he promised any leniency in exchange for his statement. Neither Ms. White nor the Defendant asked to cease questioning at any

time on June 7.  Both the advice of rights form and the Defendant's statement were introduced at the suppression hearing.

Ms. White testified for the defense at the suppression hearing.  She said that the June 5 interview began with some questioning about the other shooting.  After a few questions about that case, she and the Defendant were presented with a waiver of rights form.  Ms. White could not say whether the Defendant read the form.  She said she signed the form because Lt. Currin told her they needed her signature in order to question the Defendant.  As to the victim's murder, Lt. Currin told the Defendant that someone named Jeremiah had implicated him, and that she suspected Jeremiah was involved.  The Defendant began to cry, but did not say anything.

Ms. White testified that, shortly thereafter, some of her family members arrived at the homicide office and wanted to see her.  She left the interview room.  When she tried to reenter a few minutes later, she found that the door was locked.  She was not allowed back into the room until twenty minutes later, when someone came out of the room and told her the Defendant wanted to speak to her.  When she entered the room, the Defendant said, "Momma, they're going to kill me."  Ms. White then told the Defendant not to say anything else, and she told detectives they could no longer question the Defendant.

Ms. White received a call from Lt. Currin on June 7, and she came to the homicide office.  Lieutenant Currin read her Taylor's statement and parts of Washington's statement.  Both implicated the Defendant.  Lieutenant Currin said that if the Defendant declined to give a statement, he would go to jail for the rest of his life.

Ms. White, Lt. Currin, and other officers rode to the juvenile court building.  After a detention hearing, Ms. White and the Defendant went to an interview room.  Lieutenant Currin told the Defendant that Taylor and Washington had implicated him in the victim's death, and that he would be charged with first degree murder and go to jail for life if he chose not to give a statement. Hearing this, Ms. White agreed to let the Defendant give a statement. The Defendant again denied any knowledge of the victim's death, however.  The Defendant began to cry, as did Ms. White; the interview broke a few times to allow the two to regain their composure.

Ms. White testified that she then forced the Defendant to give his statement.  She thought that she was helping him.  She did not understand that she could have asked for a lawyer.  She also said that no Miranda rights were given before the June 7 statement, and that Lt. Currin showed them their June 5 waiver of rights form only after the Defendant gave the statement.

The Defendant also testified at the suppression hearing. He said that he was questioned about the other shooting and about the victim's death for two to four hours on June 5 before Ms. White arrived. The Defendant told detectives he knew nothing about either. One of his interviewers, Det. Simms, told him he would get a life sentence and be raped in jail. The Defendant was not given a rights waiver form until after Ms. White arrived on that day.

The Defendant said that, in the June 7 interview, Lt. Currin gave him Taylor's and Washington's statements. He read them. The Defendant testified that he knew nothing about the victim's death before reading those statements. He gave his statement using the information he had read in those statements, and he said he simply accused Taylor and Washington of the acts they said he committed. The Defendant said he was shown the rights waiver form he had signed on June 5, but not until after he gave his statement. On cross-examination, he admitted that he understood he did not have to give a statement. The trial court denied the Defendant's motion to suppress.

## II. Trial

At trial, the State first presented the victim's grandmother, Betty Shaw, who identified a picture of the victim but had no personal knowledge of any of the circumstances surrounding his death.

Joshua Taylor, a co-defendant in the victim's murder, testified that, on a day in May 2004, he was with the Defendant and Quincie Washington at Washington's house. At between 9:00 and 10:00 p.m., the three of them drove through North Memphis in Washington's car. Washington drove the car. The Defendant sat in the front passenger seat, while Taylor sat behind Washington.

After driving for some time, the occupants of Washington's car saw the victim walking down the street. Washington stopped the car. He, Taylor, and the Defendant got out of the car and approached the victim. Washington had a .38 pistol, and the Defendant had a nine millimeter pistol. Both pointed their weapons at the victim. Taylor did not have a weapon. He also did not know the victim. The Defendant, Taylor, and Washington forced the victim into the car. The Defendant continued to point his gun at the victim.

Taylor said Washington turned right on a nearby street, then turned right onto a bike trail leading into a field. The Defendant and Washington asked the victim for money and drugs. The victim responded that he did not have any. Washington stopped the car about halfway down the trail. All of the occupants got out. Washington opened the vehicle's trunk and took out a red gasoline can. He told the Defendant to carry it. The Defendant did so.

Washington then shot the victim once. The victim leaned against a nearby fence. The Defendant had his gun out, but did not fire it.

Washington then told the Defendant to help him carry the victim, who was still alive. The Defendant did so. They carried him into the field at the end of the bike trail. They laid him down in the grass. Washington then shot the victim two or three more times. The victim stopped breathing. The Defendant, still carrying the gas can, walked over to the victim's body. At Washington's direction, he poured gasoline from the can onto the victim's body and set it on fire. Taylor watched for a few seconds before walking away along the bike trail. Taylor saw Washington and the Defendant, in Washington's car, backing down the bike trail a few minutes later.

On cross-examination, Taylor clarified that Washington gave the Defendant the nine millimeter pistol and that Washington was generally in charge of all circumstances surrounding the killing. Taylor believed Washington to be in his late twenties; both Taylor and the Defendant were fifteen years old at the time of the killing. Taylor said that the State had not offered him any plea agreement or other incentive in exchange for his testimony. He also acknowledged that he was afraid of Washington at the time of the killing and that he did not know there would be a robbery when he left the house with Washington and the Defendant. Finally, Taylor admitted that, in a previous statement, he had said that Washington had poured the gasoline on the victim's body.

Jeremiah Hoskins, a Memphis resident who was acquainted with Washington and the Defendant, testified that he loaned the Defendant a gasoline can in 2004, although he could not remember the month.

Maggie Cannady, a resident of the Defendant's Memphis neighborhood and acquaintance of the Defendant, testified that "on a Friday morning in May of 2004," the Defendant approached her on her front porch. He was carrying two guns. Having never before seen the Defendant with a gun, Ms. Cannady asked the Defendant why he had them; he responded that he intended to sell them. He looked uncomfortable and was not smiling, as he usually was. The Defendant asked Ms. Cannady if he could stay with her. She said that he could if he left the guns at his house. The Defendant walked away and returned between 8:00 and 9:00 p.m.

The police came to the house the following morning, apparently after the Defendant had left. They were looking for the .38 revolver the Defendant had been carrying. Miss Cannady testified that "Willie," another resident of the house, told her that the Defendant had left that gun there. Miss Cannady directed the police to the gun. Anthony Mullins, at the time a Sergeant in the MPD homicide division, testified that he received the weapon from

Ms. Cannady, delivered it to the MPD property room, and arranged to have it processed for fingerprints. He had no other involvement in the investigation of the victim's death.

Daniel Jacobs, an officer with the MPD crime scene unit, was called on May 29 to the field in which the victim's body had been found. He reached the field through a "trodded down" bike path. Upon reaching the field, he observed a severely burned, badly decomposed body in the center of an area of burned grass. Officer Jacobs introduced pictures and a diagram of the scene.

Don Carpenter, an expert in latent and chemical processing, testified that he worked in the MPD crime response unit in June 2004. He tested Washington's car for fingerprints, but was unable to locate any ridge detail that might have indicated the presence of an identifiable fingerprint. He testified that this lack of ridge detail was not unusual for a car stored outside.

Sergeant Paula Harris of the MPD homicide division testified that, on June 11, she retrieved from the morgue the bullets that had been recovered from the victim's body. She took them to the MPD property room and had no other involvement in the investigation of the victim's death.

Tennessee Bureau of Investigation forensic scientist Cervinia Braswell testified as a keeper of records regarding forensic scientist Steve Scott's examination of the .38 revolver recovered by Sgt. Mullins, as well as a bullet and bullet fragments from the victim's body. Testing determined that the bullet and bullet fragments were of a caliber that could not have been fired from the .38 revolver.

Lieutenant Currin also testified. Her testimony at trial was substantially the same as her testimony at the suppression hearing. She introduced the Defendant's June 5 rights waiver form, as well as the Defendant's June 7 statement. She reiterated that she never questioned the Defendant without Ms. White present. She also noted that the Defendant never asked for food or water on June 7.

In his statement, the Defendant admitted that he was present, along with Taylor and Washington, when the victim was killed. He said Washington and Taylor picked him up in Washington's car. Washington asked the Defendant if he wanted to become a member of the Gangster Disciples; the Defendant said he did. Washington then told him he had to rob someone if he wanted to become a member of the gang. Shortly thereafter, they saw the victim walking down the street; the Defendant thought that Washington knew the victim. Washington told the victim to get in the car; he got in the back seat, behind the Defendant. The Defendant then "pulled out a .38 revolver and robbed him," taking "some weed and

some powder and some money." Washington took possession of all of the money and drugs. The Defendant, who had received a .38 revolver from Washington, shot the victim once in the left leg after he and Washington carried the struggling victim to the field. The Defendant was the first to shoot the victim. Washington, who had a "chrome and black gun like a nine or a forty," "shot [the victim] and shot and kept on shooting him." Taylor and Washington poured gas on the body from a gas can the Defendant had obtained from "Jeremiah." Washington set it on fire. The three left a few minutes later, and Washington told Taylor and the Defendant not to tell anyone what had happened. The Defendant said that the robbery and the murder were Washington's ideas. The Defendant did not help the victim because he was scared Washington would kill him. One of the final questions recorded in the statement asked the Defendant, "Did you give this statement freely and voluntarily without any threats, promises, or coercion?" He responded, "Yes, I gave it on my own." The Defendant also said that "[Washington] told [him] and [Taylor] that if [they] said something he would kill [them], or if [they] didn't do it he would have someone else do it. [The Defendant] didn't mean for the victim to get killed."

William Woodard, who served in May 2004 as a detective in the MPD homicide division, testified that the victim's mother told him where to get a copy of the victim's dental records. He arranged to have the records sent to Regional Forensic Center. Harry Mincer, an expert in forensic dentistry, testified that these records matched the body found in the field.

Doctor Thomas Dearing, an expert in forensic pathology, performed an autopsy on the victim's body. The body was decomposed to the extent that no organ tissue or blood samples could be recovered. Doctor Dearing found a bullet in the body, as well as five bullet fragments. He found evidence that the victim was shot either two or three times; there was one entrance wound behind the victim's jaw and one in his arm. He did not find any evidence of a bullet in the lower extremities.

Lieutenant Jessica Burton of the MPD homicide division testified that, in June 2004, she picked up shoes, clothing, socks, and maggot samples from the medical examiner's office. These items had been taken from the victim's body. Lieutenant Burton delivered the items to the MPD property room. She had no other involvement in the investigation of the victim's death.

The Defendant chose not to testify, but called Quincie Washington, his other co-defendant, as a witness. Washington said he "knew of" the Defendant and Taylor, but did not know them. He said he gave police two statements regarding the victim's death, in which he said the Defendant and Taylor were involved. At trial, however, Washington denied that he ever named the Defendant and Taylor as the crime's perpetrators.

Washington said he did not kill the victim, although he admitted to being present when the victim was killed. He did not know the victim, although the victim did ride in his car. He did not set the victim on fire and did not give the Defendant a gun. He admitted to being convicted of aggravated assault in 1997 and aggravated burglary and theft in 2000. Washington was thirty-one years old at the time of trial.

The jury convicted the Defendant of one count of felony murder, one count of especially aggravated robbery, and one count of second degree murder. He now appeals.

## Analysis
## I. Denial of Motion to Suppress the Defendant's Statement

The Defendant first contends that the trial court erred in denying his motion to suppress his inculpatory statement because he was not read his Miranda rights before questioning began on June 7, and because his mother was used to coerce him into giving a statement. "[A] trial court's findings of fact at a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). However, we review de novo a trial court's application of law to the facts. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). In denying the motion to suppress, the trial court found that the Defendant's statements were
"voluntary, freely and given without duress. . . ."

### A. Failure to Give Timely Miranda Warnings

The right against self-incrimination is protected both by the Fifth Amendment to the United States Constitution, and the Tennessee Constitution, article I, section 9. To help insure the protections of the Fifth Amendment in the criminal process, the United States Supreme Court held in Miranda that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444.

The Defendant argues that he was not read his Miranda rights on June 7 until after he gave his statement. To establish this, however, he relies on his own testimony and that of Ms. White. The trial court was evidently unconvinced by their testimony, and the evidence does not preponderate against that conclusion. The Defendant also argues that Lt. Currin's testimony establishes that he was not read his Miranda rights until immediately before he

gave his statement, meaning that he had been questioned for hours on June 7 before being "Mirandized."

The Defendant does not contend, however, that the police failed to read him his Miranda rights on June 5, and cites no authority for the proposition that police, having advised him of his Miranda rights on June 5, were required to do so again before questioning him on June 7. He instead relies on our supreme court's guidance that "extraction of an illegal, unwarned confession from a defendant raises a rebuttable presumption that a subsequent confession, even if preceded by proper Miranda warnings, is tainted by the initial illegality." State v. Northern, 262 S.W.3d 741, 763 (Tenn. 2008) (quoting State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992)). Here, we are not presented with such a situation. Under the facts accepted by the trial court, the Defendant was read his Miranda rights twice before giving his June 7 statement. This Court has previously noted that "[o]ur law recognizes that an accused need not be given repeated Miranda warnings once he has been advised of his rights and has waived them." State v. Pride, 667 S.W.2d 102 (Tenn. Crim. App. 1983) (citing Reaves v. State, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975)). The Defendant was advised of his Miranda rights on June 5 and executed a signed waiver form. This issue is without merit.

### B. Coerced Statement

The Defendant next contends that the police used his mother to coerce a statement from him. As acknowledged by the Supreme Court in Dickerson v. United States, 530 U.S. 428 (2000), the courts have long recognized that "coerced confessions are inherently untrustworthy." Id. at 433. The federal constitution provides two bases for the requirement that a confession be voluntary in order to be admissible at trial: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. See id. Under the Fifth Amendment, to be admissible a confession must be "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Bram v. United States, 168 U.S. 532, 542-43 (1897). Due process jurisprudence determines the voluntariness of a confession by examining whether the accused's will was overborne by the circumstances surrounding his or her confession. See Dickerson, 530 U.S. at 434. "The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

The Supreme Court explained the repugnance of involuntary confessions in Rogers v. Richmond, 365 U.S. 534 (1961):

Our decisions under [the Fourteenth] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

Id. at 540-41. Thus,

The attention of the trial judge should [be] focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined . . . .

Id. at 544. Significantly, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Criminal suspects in Tennessee are granted even greater protection than that afforded under the Federal Constitution: "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996). "In Tennessee, the particular circumstances of each case must be examined as a whole. A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather, 'coercive police activity is a necessary predicate to finding that a confession is not voluntary....'" Id. (citations omitted) (quoting State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)). Our supreme court continued: "The critical question is whether the behavior of the state's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." Id. (quotation marks omitted). That is, "[t]o render a subsequent statement involuntary, the tactics of the state actor must be so coercive as to overbear the defendant's will." Id. at 456. Thus, as this Court has previously recognized, "'A confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession.'" State v. Ann Marie Thornton Kelly, No. M2001-01054-CCA-R3-CD, 2002 WL 31730874, at *15 (Tenn. Crim. App., Nasville, Dec. 5, 2002) (quoting Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002)).

-11-

After our review, we conclude the evidence does not preponderate against the trial court's apparent findings that the testimony offered by Ms. White and the Defendant was less reliable than that offered by Lt. Currin. After our de novo application of the law to those facts, we conclude that the Defendant has failed to demonstrate police coercion or overreaching. We initially note that the Defendant affirmed, in his statement, that he spoke to the police "freely and voluntarily without any threats, promises, or coercion." Mindful of the possibility that a coercive environment could have induced the Defendant to incorrectly affirm the free and voluntary nature of the statement, however, we note that the Defendant failed to produce evidence that his will was overborne. He testified at his suppression hearing that he knew he did not have to give a statement. The facts establish only that the Defendant received advice from his mother and took her opinion into account in deciding to give a statement. This issue is without merit.

## II. Sufficiency of the Evidence

The Defendant next contends that the State presented evidence insufficient to convict him of especially aggravated robbery, second degree murder, or felony murder. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

**A. Second Degree Murder**

Second degree murder is a knowing killing of another. <u>See</u> Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. <u>See</u> Tenn. Code Ann. § 39-11-302(b). The Defendant notes that the evidence established Washington as the victim's killer. The evidence contains some contradictory proof on this point. Taylor testified that the Defendant carried a nine millimeter pistol and that Washington carried a .38 revolver; the medical examiner, however, testified that the victim could not have been shot with the .38. Taylor affirmed, however, that Washington shot the victim, and the Defendant said in his statement that he had a .38, so it appears that Taylor was mistaken at trial about which weapons the Defendant and Washington carried.

Because there was proof which established Washington as the one who fatally shot the victim, we must evaluate the Defendant's guilt under a theory of criminal responsibility. Tennessee statutes provide that a person is "criminally responsible for an offense committed by the conduct of another if: [A]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Tenn. Code Ann. § 39-11-402, Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." <u>State v. Lemacks</u>, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which that defendant's participation in the crime may be inferred. <u>State v. Ball</u>, 973 S.W.2d 288, 293 (Tenn.Crim.App.1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. <u>State v. Caldwell</u>, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principal in the first degree." <u>State v. Maxey</u>, 898 S.W.2d 756, 757 (Tenn. Crim. App.1994).

We conclude that the proof is sufficient to establish that the Defendant associated himself with the victim's killing, in that both he and Taylor placed him at the scene and detailed his efforts to assist Washington. The proof is also sufficient to show that the Defendant had knowledge that the victim was to be killed and that he knowingly associated

himself with that killing: he obtained a gas can from Jeremiah Hoskins and, according to Taylor, helped Washington carry the victim after the victim had been shot. Taylor also testified that the Defendant helped Washington burn the victim's body and stayed with Washington to watch it burn. We also note that the Defendant admitted in his statement that he shot the victim once in the leg, although the medical examiner found no evidence thereof. This evidence is sufficient to establish that the Defendant is guilty beyond a reasonable doubt of second degree murder through a theory of criminal responsibility.

### B. Especially Aggravated Robbery

Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. See Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. See Tenn. Code Ann. § 39-13-403(a). The Defendant's statement establishes that he knowingly used a .38 revolver to take money and drugs from the victim. As a firearm, a .38 revolver is a deadly weapon. See Tenn. Code Ann. § 39-11-106(a)(5)(A). The Defendant therefore violated the aggravated robbery statute, which includes a robbery accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1).

In State v. Owens, 20 S.W.3d 634, 637 (Tenn. 2000), our supreme court interpreted simple robbery's requirement that a theft of property occur "by violence or putting the person in fear," see Tenn. Code Ann. § 39-13-401(a), considering when such violence or fear must occur relative to the theft in order to qualify as robbery. In Owens, a defendant stole clothing from a retail store. Id. at 641. After fleeing security personnel for at least five blocks, he turned, dropped the clothing, and threatened a pursuing security guard with a box cutter. Id.

The court held that the defendant was not guilty of robbery because his "use of violence or fear was subsequent to the taking and temporally remote." Id. The court "adopted the common law rule" and interpreted the statute as requiring that such violence or fear "precede or be concomitant to or contemporaneous with the taking of property to constitute robbery." Id. at 637. The court adopted this interpretation rather than the "continuous offense theory" used in many jurisdictions, which "interpret[s] robbery as a continuous offense 'that is not complete until the perpetrator reaches a place of temporary safety.'" Id. at 638-39 (quoting Ball v. State, 699 A.2d 1170, 1183-85 (Md. 1997)). The court noted that "an overwhelming majority [of continuous offense theory jurisdictions] have [adopted that theory] with the help of statutes which specifically define robbery to include the use of force to retain property or to escape." Id. at 639. Because Tennessee Code Annotated section 39-13-401(a) does not define robbery in this way, our supreme court declined to adopt the continuous offense theory, instead applying the common law rule stated above.

We conclude that the Owens reasoning is similarly applicable to Tennessee Code Annotated section 39-13-403(a)'s requirement that an especially aggravated robbery be one "where the victim suffers serious bodily injury." As with Tennessee Code Annotated section 39-13-401(a), this section does not define especially aggravated robbery to include the infliction of serious bodily injury to retain property or escape. We therefore conclude that the serious bodily injury required for a conviction of especially aggravated robbery must "precede or be concomitant to or contemporaneous with the taking of property . . . ." Owens, 20 S.W.3d at 637.

On that basis, we conclude that the evidence is insufficient to demonstrate that the robbery of the victim was one "where the victim suffered serious bodily injury." Although the victim in this case suffered serious bodily injury when he was shot and killed, the Defendant's statement, standing as the only evidence that a robbery occurred, establishes that the robbery was complete before the Defendant, Taylor, and Washington exited the car with the victim. Taylor's statement, although it indicates that the victim had no money or drugs, agrees that the victim was asked to hand over his valuables while the car's occupants were still "riding down the bike trail." It is also clear that some time passed between when the victim was robbed and when he was shot; the victim was not, for instance, robbed and then immediately removed from Washington's vehicle and shot—a sequence of events in which the victim's serious bodily injury could be considered contemporaneous with the taking of property.

We therefore modify the Defendant's especially aggravated robbery conviction to a conviction of aggravated robbery. Because the record does not include the Defendant's presentence report or a transcript of his sentencing hearing, we are unable to resentence him. We accordingly remand this case to the trial court for resentencing on the aggravated robbery conviction.

### C. Felony Murder
The Defendant next challenges the sufficiency of the evidence convicting him of felony murder. Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). Having concluded that the aggravated robbery committed by the Defendant was not one where the victim suffered serious bodily injury, we therefore must now consider whether the killing of the victim was committed "in the perpetration of" that aggravated robbery.

Our supreme court has noted that

when determining whether a killing was committed "in the perpetration of" a felony, the majority of courts in other jurisdictions also consider whether the killing and the felony are closely connected in time, place, causation, and continuity of action. If the felony and killing occur as part of a continuous criminal transaction, the felony murder rule applies. However, where there is a break in the chain of events between the felony and the killing, the felony murder rule does not apply. One of the most important factors to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety. If the felon has gained a place of temporary safety after commission of the felony and before the killing, the felony murder rule generally does not apply.

State v. Pierce, 23 S.W.3d 289, 294-95 (Tenn. 2000) (internal citations omitted). As to the theft at issue in Pierce, the court agreed with the majority of jurisdictions and "conclude[d] that in determining whether the evidence is sufficient to support a conviction of first degree murder in the perpetration of theft, a court must determine whether the killing is closely connected to the initial taking of the property in time, place, causation, and continuity of action." Id. at 295.

As noted in the previous section, the determination of when a robbery is complete is not dependant upon whether the perpetrator has gained a place of temporary safety, as it does in jurisdictions using the continuous offense theory. See Owens, 20 S.W.3d at 638-39. This remains an important consideration, however, in determining whether a killing was committed in the perpetration of a felony. See Pierce, 23 S.W.3d at 295. The defendant in Pierce stole a vehicle and, twenty days later, perpetrated a killing with the vehicle while fleeing from police. The supreme court found the evidence insufficient for felony murder because the defendant had gained a place of temporary safety before the fatal pursuit began, conclusively indicating that "the killing was completely unconnected to the initial taking of the vehicle . . . ." Id. at 297.

In this case, the Defendant did not gain a place of temporary safety between his commission of aggravated robbery and the killing of the victim. The robbery was also closely connected to the killing in both time and place; the victim was killed a short distance away from Washington's vehicle, and apparently within minutes, at most, of the robbery. The killing was also causally connected to the aggravated robbery in the sense that it may have been motivated by a desire to evade detection for that felony. Finally, the killing was certainly connected to the robbery in continuity of action, and it took place as apart of a "continuous criminal transaction." Id. at 294. These facts are sufficient to support the

Defendant's conviction of felony murder beyond a reasonable doubt. Accordingly, this issue is without merit.

## III. Merger of Offenses

Because there was only one homicide victim in this case, the Defendant's dual convictions for both second degree and first degree murder cannot stand. In order to satisfy double jeopardy concerns, the trial court should have merged the lesser offense of second degree murder into the greater offense of felony murder. See State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997); State v. Barnes, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993). We therefore remand this case to the trial court for entry of a judgment reflecting the merger.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's conviction for first degree felony murder. We order that the second degree murder conviction be merged into the first degree murder conviction. We remand for entry of a judgment reflecting merger. We also modify his especially aggravated robbery conviction to an aggravated robbery conviction, however, and remand for resentencing on that conviction.

_____
DAVID H. WELLES, JUDGE

-17-